IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

VALINDA F. OLADEINDE, ET AL., )
)
    Plaintiffs )
) CIVIL ACTION NO.
VS. )
) 91-AR-0196-S
)
CITY OF BIRMINGHAM, ET AL., )
)
    Defendants )
)

**MEMORANDUM OPINION**

    The court has under consideration several motions filed in the above-entitled case dealing in different ways with the methods by which this court selects its juries. Defendant, City of Birmingham ("City"), and the three individual defendants who were officers of the City, have mounted their second attack on the jury plan of the United States District Court for the Northern District of Alabama. *See Oladeinde v. City of Birmingham*, 840 F. Supp. 867 (N.D. Ala. 1996). A majority of the citizens of the City are black, and two of the three individual defendants are black. The court has permitted defendants to question the juror selection process or plan a second time only because the court's current selection of venirepersons is somewhat different from what it was when the court first considered this question. More specifically, at present, the court's juror selection process is being handled by a third-party vendor who has a contract with the Administrative Office of the

United States Courts rather than being administered internally by the court's own employees. The court-administered plan was not only unsuccessfully attacked earlier in this very case, but it was upheld in *United States v. Underwood*, 617 F. Supp. 713 (N.D. Ala. 1985); *United States v. Grisham*, 41 F. Supp. 1138 (N.D. Ala. 1994), *aff'd*, 63 F.3d 1074 (11th Cir. 1995); *Morro v. City of Birmingham*, 926 F. Supp. 1033 (N.D. Ala. 1996); and *Alghanee v. City of Birmingham*, CV 96-AR-0109-S (N.D. Ala. 1997).

Despite the previous examination of the Northern District of Alabama's plan in this very case, the court is willing to take a renewed look at the court's jury selection system in order to ascertain: (1) whether it is functioning substantially as it was functioning when managed entirely by the court; and (2) whether it is producing substantially the same results insofar as the racial makeup of the jury wheel and the jury venires actually appearing for jury service. In the event that incidental flaws should be detected (i.e., flaws that do not rise to statutory or constitutional violations of sufficient magnitude to endanger both currently scheduled criminal or civil jury trials and the results of trials conducted since the independent contractor was employed by the Administrative Office), the court can address those flaws without attempting drastic surgery on the plan, something which, in this judge's opinion, would call for reconsideration of the plan by the entire court and possibly by the Eleventh Circuit and/or by the

Supreme Court.

This case has been pending since 1991, and, as noted, in the interim, defendants have already mounted one attack on the jury selection system. Recently, the case has been finally pre-tried, and it is now set for jury trial on June 22, 1998. If a majority of the whole court should vote to adopt a totally new jury plan, or if this senior member of the court should decide to devise a jury selection process for this particular case that is sufficiently different from the current plan that it would be impossible to implement in time for the June 22, 1998 trial setting, then the trial would have to be postponed. Plaintiffs argue with persuasive force that defendants' renewed attack comes too late and that another postponement would be terribly unfair to their cause. It is unnecessary to agree or disagree with plaintiffs' position on the questions of timeliness and prejudice because, as will be seen, the conclusions reached hereinafter by this court render plaintiffs' said contentions moot.

Most, if not all, of the previous opinions ruling on the compliance or non-compliance of the Northern District's jury plan with statutory or constitutional standards involve varying degrees of racial arithmetic. This particular judge is among that pitiful group of senior judges which is woefully ignorant of the methods of statistical analysis, and yet this court is unwilling to be enlightened by competing would-be experts who in this case would,

no doubt, praise on the one hand, and lament on the other, the characteristics of the court's present jury selection system. Considering that the present system has already been approved by a substantial majority of this court and by the Eleventh Circuit, further discovery and so-called expert opinion would involve time and expense which this court deems unnecessary, <u>unless</u> this court should detect, with what it now has available, including evidentiary materials and briefs from defendants, a substantial change in the racial percentages being produced by the present system.

It is, of course, true that the members of this court do not pretend to constitute a monolith, much less actually form one. However, they do, from time to time, attempt to reach a consensus on important matters of mutual concern and court administration. Thus far, they have not achieved unanimity on the question here being considered, but all judges have cooperated with this particular judge to call upon the clerk's office, upon the Administrative Office of the United States Courts, and upon the vendor both to investigate and to report the pertinent facts with respect to the jury selection process under the present regime. All relevant information from these sources have been shared by the clerk with counsel for the parties. Little else that is relevant could be produced.

The evidence reflects that in anticipation of jury needs

between October 1, 1997, and September 30, 2001, the vendor randomly selected 50,000 names from the voter rolls in the 31 Alabama counties that make up the Northern District. This pool of 50,000 persons constitutes the current master jury wheel. The vendor then randomly selected a pool of 20,000 names from the larger pool of 50,000. Both pools were approximately 18% black, which is the same percentage of the black population in the Northern District of Alabama as reflected in the 1990 census. The percentage of blacks in the "qualified wheel" produced by the mailing to the pool of 20,000 declined to 11.9%. This decline does not deviate substantially from the decline seen by the clerk before the private vendor took over the implementation of the jury plan. The clerk and this judge have concluded that the drop from 18% black in the master jury wheel to 11.9% black in the "qualified wheel" is occasioned by the fact that a higher percentage of blacks both fail to receive and fail to respond to the jury questionnaire.

  Without attempting to represent the thoughts of other judges, this judge believes that his conclusion reflects the thoughts of a majority of the court. Chief Judge Pointer, seeking to improve the incidence of response and, thus, to increase the percentage of actual jury participation by black citizens, mailed a letter and "follow-up" questionnaire on March 30, 1998, to all prospective jurors, black and white, who failed to respond to the vendor's questionnaire that produced the "qualified wheel" now being used by

the court. A copy of Judge Pointer's cover letter is attached hereto as Exhibit "A" and is incorporated herein as if set forth in full. It is impossible to predict what effect, if any, Judge Pointer's letter will have; however, an intelligent guess is that it will improve the percentage of juror participation by black citizens in the Northern District of Alabama. This is certainly the hope of the court.

There are certain ironies in the current procedural situation. In *Morro v. City of Birmingham*, 926 F. Supp. 1033 (N.D. Ala. 1996), the same municipality that is being sued in the instant case objected strenuously to the fact that there were no blacks on that particular jury venire randomly selected from the total venire summoned for that term of court. This court responded as follows:

### The City's Attack on the Jury Venire

> When the venire appeared for the selection of seven civil jurors for the trial of this case, the venire consisted of eighteen white venirepersons. Defendants complained about the absence of black venirepersons, but the court proceeded with jury selection. Defendants adequately preserved their objection to the venire.
>
> Even before the filing of the City's current Rule 50(b) motion, the court undertook its own investigation into the matter of the venire composition. The court consulted with the jury section of the Clerk's office and with other members of the court and arrived at the same explanation for the racial makeup of this particular venire as can be deduced from the City's motion. In solving one problem *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986), created another. This venire was randomly drawn for this court's one case mid-month civil docket to start on March 18, 1996. The venire came from the "leftovers" from a much larger venire summoned for jury duty to commence at the beginning of the month on March 4, 1996, and designed to accommodate the jury needs in several criminal and civil trials before various judges.

It quickly becomes apparent that the juries actually empaneled in the Northern District of Alabama at the first of the month, by the exercise of so-called "preemptory" challenges, contain a higher percentage of black jurors than the original venire as a whole. This fact strongly suggests that *Batson* acts as a brake on the striking of black venirepersons, and has the indirect effect of leaving the remaining pool with a higher percentage of whites and a lower percentage of blacks than were in the original, total venire. In other words, by the middle of the month, the black jurors have been disproportionately "used up" as a proximate consequence of *Batson*. This court's research has not led it to a solution of this problem, if it is a problem, or to any case law which would render unconstitutional or illegal this court's present system of jury selection. It would be enormously expensive, and perhaps unconstitutional, to randomly select from 31 north Alabama counties a separate venire for each and every specific jury case. The court can conceive of no other method that would come close to assuring an apportional racial representation in every venire.

Although *Batson* itself was not invoked in this case, except perhaps in an indirect way, *Batson* and its progeny are as much designed to protect potential jurors from disparate treatment as to guarantee litigants a racially or gender balanced jury. Therefore, if the local media correctly reports that the Mayor was not surprised by the verdict in this case against the City "from an all white jury," the Mayor is only exercising his freedom of expression, just as the jury found Morro to be doing. The Supreme Court in *Batson* would not agree with the Mayor as to what can be expected from an all-white jury, because it there said:

> Just as the Equal Protection Clause forbids the States to exclude black persons from the venire on the assumption that blacks as a group are unqualified to serve as jurors, so it forbids the States to strike black veniremen <u>on the assumption that they will be biased</u> in a particular case simply because the defendant is black. The core guarantee of equal protection, ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors <u>on the basis of such assumptions</u>, which arise solely from the jurors' race.

476 U.S. at 98, 106 S.Ct. at 1724 (emphasis supplied) (citation omitted). This expression can only mean that the Supreme Court believes, as this court does, that jurors of whatever race are presumed to be free of race prejudice, especially when they are instructed that prejudice can play no part in their deliberations.

7

*Id.* at 1042. In its petition for certiorari to the Supreme Court, the City's brief contained the following:

> The final element that must be proved whether [sic] the venire was selected under a practice providing an opportunity for discrimination. The venire was empaneled on March 4, 1996. The defendant [sic] trial started on March 18, 1996, at which time a fresh panel of jurors was available to select from. The venire use [sic] had been available for previous trials over its two week tenure. Several petit jury [sic] were selected from the venire diminishing the representation of African-Americans on the venire. When the holdover venire reached the defendant [sic] trial the African-American representation was zero. No African-Americans were on the venire. The practice of discretionally using "holdover" venire when a fresh pool is available provides an opportunity for discrimination. A court knowingly using a holdover venire, knowing that the African-Americans representation was likely diminished, knew or should have known that its practice provided an opportunity for discrimination.

Petitioner's brief at p. 38a. The Eleventh Circuit in *Morro v. City of Birmingham*, 117 F.3d 500, *reh'g denied*, 127 F.3d 42 (11th Cir. 1997), had affirmed judgment against the City without addressing any issue of the jury makeup. The Supreme Court, without opinion, denied the City's petition for certiorari on March 23, 1998. 1998 WL 124935 (U.S.)

In *Alghanee v. City of Birmingham*, CV 96-AR-0109-S (N.D. Ala. 1997), a recent jury case tried by this court, the particular jury venire, as in *Morro*, was all white. There, however, all seven <u>plaintiffs</u> were black. The defendant City there interposed no objection whatsoever to the venire composition, to the jury plan, or to what the plan there produced. Rather, it was the plaintiffs who strenuously objected to the jury composition. They received from the court the same answer that the City had received in *Morro*,

namely, that *Batson* has the deleterious effect of making lawyers reluctant to strike black venirepersons for fear that they will not be able to justify their strikes in terms other than race when cross-examined by the court and by opposing counsel, and, thus, of "using up" the reporting black venirepersons early during the court term, thereby leaving a progressively increasing percentage of white venire persons for subsequent cases. This irony only illustrates the difficulty, if not the practical impossibility, of achieving an ethnically and gender-balanced venire for every case. We live in an imperfect world that has created imperfect courts.

## **Conclusion**

This opinion and the materials obtained and produced by the clerk will, by pre-agreement, be shared by the undersigned with the entire court, which can then take such action as the court, or its individual judges, deem appropriate in order to assure that the juries selected for the trial of future civil and criminal cases in the Northern District of Alabama continue to meet statutory and constitutional standards and that the method of selection of jury is uniform to the extent possible so that all litigants can know what to expect.

Meanwhile, orders on the various pending motions consistent with this opinion will be entered.

DONE this __3rd__ day of April, 1998.

                                                _/s/ William M. Acker_
                                                WILLIAM M. ACKER, JR.
                                                UNITED STATES DISTRICT JUDGE

cc: All judges and magistrate judges of the court

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**FEDERAL COURTHOUSE**
**BIRMINGHAM, ALABAMA 35203**

CHAMBERS OF
SAM C. POINTER, JR.
CHIEF JUDGE

March 30, 1998

Dear Prospective Juror:

    In 1997 the U. S. District Court for the Northern District of Alabama mailed a Juror Qualification Questionnaire to you. The questionnaire was not returned to the court. Enclosed is a second questionnaire for you to complete.

    Please read both sides of the enclosed questionnaire. Fully complete the questionnaire and return it in the enclosed envelope within ten days so we can make a determination as to your availability to serve as a juror. Thank you for your cooperation in this important matter.

Sincerely,

*Sam C. Pointer*

Sam C. Pointer, Jr.  Chief Judge

EXHIBIT "A"